HULETT HARPER STEWART LLP
DENNIS STEWART, SBN: 99152
KIRK B. HULETT, SBN: 110726
550 West C Street, Suite 1500
San Diego, CA  92101
Telephone:    (619) 338-1133
Facsimile:    (619) 338-1139

Attorneys for Plaintiffs, Nay Alidad, Galyna
Andrusyshyn, Robert Benjamin, Barbara Buenning,
Danielle Greenberg, Sheryl Haley, Lisa Hall, Tya
Hughes, Marissa Jacobus, Gabrielle Kurdt, Erica
Pruess, Seth Salenger, and Harold Stafford
[Additional Counsel on Signature Page]

## IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAY ALIDAD, GALYNA ANDRUSYSHYN, ROBERT BENJAMIN, BARBARA BUENNING, DANIELLE GREENBERG, SHERYL HALEY, LISA HALL, TYA HUGHES, MARISSA JACOBUS, GABRIELLE KURDT, ERICA PRUESS, SETH SALENGER, and HAROLD STAFFORD, on behalf of themselves and all others similarly situated, | CASE NO.  '15CV2173 WQHBLM **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | |
| BUMBLE BEE FOODS LLC, STARKIST COMPANY, TRI-UNION SEAFOODS LLC, and KING OSCAR, INC., | |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiffs Nay Alidad, Galyna Andrusyshyn, Robert Benjamin, Danielle Greenberg, Barbara Buenning, Sheryl Haley, Lisa Hall, Tya Hughes, Marissa Jacobus, Gabrielle Kurdt, Erica Pruess, Seth Salenger, and Harold Stafford, on behalf of themselves and all others similarly situated, upon personal knowledge as to the facts pertaining specifically to them, and upon information and belief as to all other matters, by and through their undersigned attorneys, bring this action for damages, injunctive relief, and all other relief available under applicable law.

## NATURE OF THE ACTION

1.      This action arises out of a conspiracy by the three largest producers of packaged seafood products in the United States to fix, raise, maintain, and/or stabilize prices for packaged seafood products within the United States (including this District), its territories, and the District of Columbia in violation of Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3) and state antitrust, consumer protection, and unfair competition statutes.

2.      These producers of packaged seafood products, Bumble Bee Foods LLC, StarKist Company, Tri-Union Seafoods LLC, and King Oscar, Inc. (collectively, "Defendants"), entered into a conspiracy that began at least as early as January 1, 2005, and continues to the present (the "Class Period").

3.      As used herein, the term "packaged seafood products" refers to shelf-stable seafood products (predominately tuna, but also including, *inter alia*, crab, mackerel, oyster, salmon, sardines, and shrimp) that are sold in cans, pouches, or ready-to-eat serving packages.

## JURISDICTION AND VENUE

4.      Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) to secure equitable and injunctive relief against Defendants for violating Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3). Plaintiffs also bring claims for actual and exemplary damages and injunctive relief pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain

restitution, recover damages, and secure all other available relief against Defendants for violation of those state laws. Plaintiffs also seek attorneys' fees, costs, and other expenses under federal and state law.

5.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337. This Court also has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367 in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from some of the Defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

6.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and Title 28, United States Code, Section 1391(b)-(d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District. Specifically, Defendant Bumble Bee Foods LLC, Defendant Tri-Union Seafoods LLC, and Defendant King Oscar, Inc. each have their principal place of business in this District.

7.     This Court has personal jurisdiction over Defendants because each, *inter alia*: (a) transacted business in this District; (b) directly or indirectly sold and delivered substantial quantities of packaged seafood products in this District; (c) had substantial aggregate contacts with this District; or (d) were engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing

2

injury to, the business and property of persons and entities residing in, located in, or doing business in this district.

## PARTIES

**Plaintiffs**

8.     Plaintiff Nay Alidad is a resident of the State of Nevada. During the Class Period, Ms. Alidad indirectly purchased packaged seafood products, for her own use and not for resale, manufactured by one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

9.     Plaintiff Galyna Andrusyshyn is a resident of the State of Iowa. During the Class Period, Ms. Andrusyshyn indirectly purchased packaged seafood products, for her own use and not for resale, manufactured by one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

10.     Plaintiff Robert Benjamin is a resident of the State of Florida. During the Class Period, Mr. Benjamin indirectly purchased packaged seafood products, for his own use and not for resale, manufactured by one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

11.     Plaintiff Barbara Buenning is a resident of the State of Nebraska. During the Class Period, Ms. Buenning indirectly purchased packaged seafood products, for her own use and not for resale, manufactured by one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

12.     Plaintiff Danielle Greenberg is a resident of the State of Florida. During the Class Period, Ms. Greenberg indirectly purchased packaged seafood products, for her own use and not for resale, manufactured by one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

13.     Plaintiff Sheryl Haley is a resident of the State of Utah. During the Class Period, Ms. Haley indirectly purchased packaged seafood products, for her own use and not for resale, manufactured by one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

14.     Plaintiff Lisa Hall is a resident of the State of Kansas. During the Class Period, Ms. Hall indirectly purchased packaged seafood products, for her own use and not for resale, manufactured by one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

15.     Plaintiff Tya Hughes is a resident of the State of North Dakota. During the Class Period, Ms. Hughes indirectly purchased packaged seafood products, for her own use and not for resale, manufactured by one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

16.     Plaintiff Marissa Jacobus is a resident of the State of California. During the Class Period, Ms. Jacobus indirectly purchased packaged seafood products, for her own use and not for resale, manufactured by one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

17.     Plaintiff Gabrielle Kurdt is a resident of the State of New York. During the Class Period, Ms. Kurdt indirectly purchased packaged seafood products, for her own use and not for resale, manufactured by one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

18.     Plaintiff Erica Pruess is a resident of the State of Nebraska. During the Class Period, while a resident of Missouri, Ms. Pruess indirectly purchased packaged seafood products in Missouri, for her own use and not for resale, manufactured by one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

19.     Plaintiff Seth Salenger is a resident of the State of Minnesota. During the Class Period, Mr. Salenger indirectly purchased packaged seafood products, for his own use and not for resale, manufactured by one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

20.     Plaintiff Harold Stafford is a resident of the State of Wisconsin. During the Class Period, Mr. Stafford indirectly purchased packaged seafood products, for his own use and not for resale, manufactured by one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

**Defendants**

21.     Defendant Bumble Bee Foods LLC ("Bumble Bee") is a domestic corporation with its principal place of business located at 280 10th Avenue, San Diego, California 92101. Bumble Bee produces and sells packaged seafood products throughout the United States (including this District), its territories, and the District of Columbia. Bumble Bee is privately owned by Lion Capital ("Lion"), based in the United Kingdom.

22.     Defendant StarKist Company ("StarKist") is a domestic corporation with its headquarters at 225 North Shore Drive, Suite 400, Pittsburgh, Pennsylvania 15212. StarKist produces and sells packaged seafood products throughout the United States (including this District), its territories, and the District of Columbia. StarKist is privately owned by Dongwon Enterprise ("Dongwon"), based in South Korea.

23.     Defendant Tri-Union Seafoods LLC is a domestic corporation with its principal place of business located at 9330 Scranton Road, Suite 500, San Diego, California 92121. Tri-Union Seafoods LLC produces and sells packaged seafood products throughout the United States (including this District), its territories, and the District of Columbia, and markets these products under the brand name Chicken

of the Sea. Unless otherwise indicated, Tri-Union Foods LLC will be referred to herein as "Chicken of the Sea."

24.     Defendant King Oscar, Inc. ("King Oscar") is a domestic corporation with its principal place of business at 3838 Camino Del Rio North, Suite 115, San Diego, California 92108. King Oscar produces and sells packaged seafood products throughout the United States (including this District), its territories, and the District of Columbia.

25.     Defendants Chicken of the Sea and King Oscar (together, "Tri-Union") are wholly owned by Thai Union Frozen Products, a public company headquartered in Thailand.

## AGENTS AND CO-CONSPIRATORS

26.     Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

27.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy, or in furtherance of the anticompetitive conduct. Plaintiffs reserve the right to name some or all of these persons and entities as defendants at a later date.

28.     Wherever reference is made herein to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business affairs.

# FACTUAL ALLEGATIONS

## The Packaged Seafood Product Industry

29.     Packaged seafood products are made from raw seafood that is processed to preserve and enhance flavor, and ensure product safety. Raw seafood is typically caught far offshore and therefore usually delivered to canneries frozen or refrigerated.

30.     An initial quality control inspection is conducted upon delivery which ensures the seafood was stored and transported at the proper temperature and is in acceptable condition.

31.     Large ovens perform a "pre-cooking" on seafood that passes the initial inspection. The seafood then undergoes further cleaning and is fed into product packages (e.g., cans, pouches, or cups). Sealing machines then close and seal the filled seafood packages.

32.     Each package is given a permanent production code identifying, *inter alia*: plant, product, date packaged, and batch. The filled and sealed packages are then cooked under pressure to make the products commercially sterile and give them a long shelf life.

33.     Packaged seafood products are sold to club warehouses, retail groceries, grocery cooperatives, mass merchandisers, and drug stores, among others.

34.     A May 2012 presentation by Bumble Bee cited total United States retail sales of shelf-stable seafood products at $2.346 billion in 2011 and at an estimated $2.397 billion in 2012. Bumble Bee estimated in one report that canned tuna represents 73% of this value. Bumble Bee also estimated that total United States retail sales of shelf-stable tuna were $1.719 billion in 2011 and were estimated to be $1.750 billion in 2012.

35.     Defendants are the three largest domestic manufacturers of packaged seafood products in a highly concentrated industry. According to the

7

aforementioned presentation by Bumble Bee, it had 29% of the domestic shelf-stable seafood market in 2011, Chicken of the Sea had 18.4%, and StarKist had 25.3%. The remaining market share was comprised of smaller companies and private label brands. With respect to shelf-stable tuna, StarKist had 34.6% of the market, Bumble Bee had 27.8% and Chicken of the Sea had 19.4%. In December of 2014, the *Wall Street Journal* reported that the Defendants' respective shares of the domestic market for canned tuna were 36% for StarKist, 25% for Bumble Bee, and 13% for Chicken of the Sea. Bualuang Securities reported the shares for the domestic canned tuna market slightly differently, with StarKist at 30%, Bumble Bee at 28%, and Chicken of the Sea at 20%.

36.   Recent mergers and acquisitions have resulted in this oligopolistic industry structure. For example, in 1997, the investment group Tri-Union Seafoods LLC, of which Defendant Thai Union Frozen Products was a member, acquired Van Camp Seafood Company ("Van Camp"). Thereafter, Thai Union Frozen Products bought out the other investors to acquire Van Camp completely, which it renamed Chicken of the Sea International, an entity that was later merged into Defendant Tri-Union Seafoods LLC. In 2008, Dongwon acquired StarKist from Del Monte Foods for $363 million. Similarly, in 2014, Thai Union Frozen Products bought King Oscar, a Norwegian sardine canner that sold 37% of its products in the United States.

37.   In what would have been the latest and most sweeping acquisition, Thai Union Frozen Products announced in December of 2014 its acquisition from Lion (subject to regulatory approval) of Bumble Bee for $1.51 billion. The combination of Chicken of the Sea and Bumble Bee would have created a virtual duopoly, with the combined entity substantially exceeding the market share of StarKist. Thai Union Frozen Products had planned to finance the acquisition partly through a preferential public offering to existing shareholders that would have raised approximately $380 million.

8

**The Department of Justice Investigation**

38.     On July 23, 2015, Thai Union Frozen Products suspended its preferential public offering in light of a grand jury investigation commenced by the San Francisco office of the antitrust division of the United States Department of Justice ("DOJ"). Thai Union Frozen Products disclosed on that day that both Bumble Bee and Chicken of the Sea had received grand jury subpoenas relating to an antitrust investigation of packaged seafood products. The publication *Undercurrent News* further reported in an article dated the same day that "Thai Union held a conference with analysts on the suspension of the share offer, in which the company's management said other US seafood producers have also received a subpoena requiring the production of relevant information to the DOJ." The publication *Global Competition Review* similarly reported as follows:

> In a letter to the Bangkok stock exchange on Wednesday, Thai Union chairman Kraisorn Chansiri confirmed that the US Department of Justice is investigating his company's sector, causing Thai Union to suspend a stock issuance that had been intended to finance the $1.5 billion acquisition of Bumble Bee.

> He said the Thai Union subsidiary Tri-Union Seafoods, which operates in the US under the Chicken of the Sea brand, had received a subpoena "requiring Tri-Union to provide relevant information to the DoJ in relation to an antitrust investigation of the packaged seafood industry in the United States."

39.     *Global Competition Review* further reported:

> An industry expert said the subpoena does not appear to be limited to the merger review, and early information indicates the demand for information came from a separate section of the antitrust division, not one tasked with analyzing deals.

> It is highly likely that something produced in the merger investigation sparked this investigation touching the industry as a whole rather than just the parties to the deal, he said.

> * * *

> The source said others in the industry are now anticipating that they too will be subpoenaed.

9

40.     It appears from these reports that StarKist also received a subpoena and that the DOJ's investigation extends to the entire domestic packaged seafood products sector.

**The Conspiracy Is Plausible Given Structure and Characteristics of the Packaged Seafood Product Market**

41.     The structure and characteristics of the packaged seafood product market in the United States are conducive to a price-fixing agreement.

42.     Packaged seafood products are sold directly to retail chains and through grocery wholesalers and distributors. As commodity products, packaged seafood product varieties have comparable shelf life, contain comparable quantities of seafood, and are marketed in cans, pouches, and cups. Therefore, purchasers of packaged seafood products are more likely to be influenced by price when making a purchasing decision.

43.     Substantial barriers discourage entry into the packaged seafood product market. These barriers include high start-up costs, manufacturing expertise, access to raw materials, and access to distribution channels. This allows Defendants to collectively raise prices without fear of being undercut by new entrants.

44.     Defendants dominate the United States packaged seafood products market; purchasers routinely source their packaged seafood products from one of the three Defendants.

45.     Defendants possessed significant market power, which allowed them to raise prices for packaged seafood products above competitive levels in the United States, its territories, and the District of Columbia.

46.     Packaged seafood products have no economically reasonable substitutes. Alternative seafood, such as frozen seafood or fresh seafood, do not have commensurate shelf lives and require preparation, such as cooking, before they can be consumed.

1      47.    Economic indications support the conclusion that there was collusive

2  pricing within the domestic packaged seafood products industry.

3      48.    Consumption of packaged seafood products in general, and canned

4  tuna in particular, has declined over the last ten years in the United States. In 2005,

5  the annual consumption was 3.1 lbs. per person, but had fallen to 2.3 lbs. per person

6  in 2013. Reporting on this decline, the *Washington Post* created the following

7  graphical representation by measuring United States annual per capita consumption

8  from 1930 to 2010:



22      49.    The same *Washington Post* article presented the following graph,

23  showing that while Americans are buying less canned seafood, they are paying

24  more for what they do buy:





Americans are buying less, but more expensive canned seafood
■ Volume sales  ■ Dollar sales

Made with Chartbuilder                                          Data: Euromonitor

50.    With such a decline in consumption of packaged seafood products, one would expect rational businesses to reduce the prices for packaged seafood products. However, the opposite occurred. According to data from the Bureau of Labor Statistics, prices for shelf stable fish and seafood actually increased from 2005 through the first part of 2015.

51.    Raw ingredient costs do not explain such price increases. The cost per metric ton of skipjack tuna rose in 2012 and early 2013, but it declined precipitously thereafter. According to the April 19, 2015 issue of *Tuna Market Intelligence*, "[a]s recently as June last year, skipjack was selling at US$1,800 in Bangkok. But the price has since plummeted to US$1,000 since the beginning of the year, with industry officials anticipating further reductions in price this year." Ecuadorian tuna exporters noted in January of 2015 that the price per metric ton had declined from $1,400 to $800. The United Nations Food & Agriculture Organization similarly noted in its May 2015 "Food Outlook" biannual report that tuna prices had dropped considerably in 2014: "tuna prices declined significantly

due to excess supply, with frozen skipjack prices hitting a 6-year low." Despite these drastically declining raw material costs, Defendants did not decrease prices and try to obtain more market share.

52.     Thai Union Frozen Products' Annual Reports discuss the benefits of increased prices combined with decreased raw ingredient costs. In its 2013 Annual Report, Thai Union Frozen Products stated that "our branded tuna business showed resilient growth from 2012 thanks to the price adjustments in Europe and *more rational market competition in the US*." (Emphasis added). The same report stated that its future profit margins would depend upon "[r]easonable US canned tuna competition without unnecessary price." In its 2014 Annual Report, Thai Union Frozen Products explicitly noted that this goal had been achieved. It stated:

> *Thanks to reduced price competition (absence of cut throat pricing)* and generally lower fish cost, *our own tuna brands marked a great year of increased profitability*. Despite minimal sales growth in the US, competitive inventory cost and reasonable market conditions helped lift the margin of our US brand.

(Emphases added).

The same 2014 report went on to note that "*sensible market competition*, supported by lower raw material costs, made it possible for our own tuna brands to expand their margins through the year despite limited volume growth." (Emphasis added). It indicated that future revenue growth would again be dependent upon "*[r]easonable US canned tuna market competition that focuses more on consumption creation than market share alone*." (Emphasis added).

53.     The "reasonable market conditions," "more rational market competition," "sensible market competition," avoidance of battles for market share and "absence of cut throat pricing" that the reports note could only have come about through collusion. It would have been against the individual self-interest of each Defendant to eschew increasing market share during this period by lowering prices.

54.     Numerous business opportunities provided Defendants ample opportunity to meet and engage in such collusion. One such opportunity is provided by the Tuna Council. As explained on that organization's website:

> The National Fisheries Institute's Tuna Council represents the largest processors and household names for canned and pouch tuna in the U.S. including *Bumble Bee®*, *Chicken of the Sea®* and *StarKist®*. The Tuna Council speaks for the tuna industry on numerous issues including food safety, labeling, sustainability, nutrition education and product marketing.

55.     An example of such joint conduct is provided by the "Tuna the Wonderfish" advertising campaign of 2011-12. This campaign was bankrolled by the Defendants and carried out under the auspices of the Tuna Council with the support of Thai processors. In it, the Defendants teamed up for marketing purposes. Joe Tuza, Senior Vice-President of Marketing for StarKist, reportedly said that "[w]e worked together surprisingly well." He said further that the campaign, intended to increase consumption of tuna, was based on the hope that "as the water level rises . . . all boats rise with the tide," referring to the three Defendant companies. The same philosophy appears to undergird the alleged price-fixing conspiracy.

56.     Another opportunity to collude was provided through bilateral copacking agreements between Bumble Bee and Chicken of the Sea. Bumble Bee copacks for Chicken of the Sea at the former's plant located in Santa Fe Springs, California with respect to West Coast sales. Chicken of the Sea does the same for Bumble Bee at the former's plant in Georgia with respect to East Coast sales. Thus, even before the proposed merger, these two companies were cooperating closely. These interlocking relationships provided an excellent opportunity to collude on pricing.

**Defendants' Anticompetitive Conduct**

57.    On information and belief, Defendants Chicken of the Sea, Bumble Bee and StarKist participated in anticompetitive activities beginning at least as early as January 2005 and continuing to the present. These activities included telephone calls, and frequent in-person meetings at specified locations, including hotels and restaurants. During these meetings and calls, Defendants shared sensitive business information, and entered into agreements to fix, raise, stabilize, and maintain prices of packaged seafood products sold to consumers in the United States.

58.    On information and belief, senior executives of Defendants met at least twice a year.

59.    On information and belief, at other times, top executives regularly discussed prices and shared sensitive customer information.

60.    On information and belief, throughout the class period, Defendants communicated regularly by telephone to discuss prices and sensitive customer information. For example, during at least one telephone conversation between Bumble Bee and StarKist executives, StarKist informed Bumble Bee that StarKist and Chicken of the Sea were in agreement to raise prices.

61.    On information and belief, Defendants discussed pricing, and agreed to coordinate the timing and amount of price increases for packaged seafood products sold to customers in the United States. Defendants also agreed to restrict capacity and allocate customers.

62.    On information and belief, Defendants agreed to exchange, and did exchange, information during their telephone conversations and meetings for the purpose of monitoring and enforcing adherence to their agreements.

**Plaintiffs Suffered Antitrust Injury**

63.    Defendants' conspiracy had the following effects, among others:

a.    Price competition has been restrained or eliminated with respect to packaged seafood products; and

b.    The prices of packaged seafood products have been fixed, raised, maintained, or stabilized at artificially inflated levels.

64.    During the class period, Defendants charged supra-competitive prices for packaged seafood products sold to Plaintiffs. By reason of Defendants' alleged violations of the antitrust laws, Plaintiffs and the Classes have sustained injury, having paid higher prices for packaged seafood products than they would have paid absent Defendants' alleged illegal contract, combination or conspiracy, and, as a result, has suffered damages in an amount to be determined. This is an antitrust injury of the type the antitrust laws were meant to punish and prevent.

65.    Packaged seafood products are identifiable, discrete products that remain unchanged from the point at which they are sold by Defendants until they reach Plaintiffs and the Classes. Packaged seafood products follow a traceable physical chain of distribution from Defendants to Plaintiffs and the members of the Classes, and price and cost changes attributable to Defendants' price-fixing conspiracy can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

66.    Just as packaged seafood products can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of packaged seafood products affect prices paid by the indirect purchasers of packaged seafood products in the chain of distribution.

67.    The economic necessity of passing through cost changes increases with the degree of competition a firm faces. The wholesale, distributor, club warehouse, retail grocery, grocery cooperative, mass merchandiser and drug store market for packaged seafood products are subject to vigorous price competition. The aforementioned market participants have thin net margins, and are therefore at the mercy of their product costs, such that increases in the price of packaged seafood products lead to corresponding increases in prices to their customers. When downstream distribution markets are highly competitive, as they are in the case of

16

packaged seafood products, overcharges are passed through to ultimate consumers, such as the indirect-purchaser Plaintiffs and members of the Classes.

68.     Hence the inflated prices of packaged seafood products resulting from Defendants' price-fixing conspiracy have been passed on to Plaintiffs and the other members of the Classes by wholesalers, distributors and retailers.

69.     Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."[1]

70.     As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers. . . . Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.[2]

---

[1]  Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. PA. L. REV. 268, 275 (1979).

[2]  Order re: Class Certification at 13-14, *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases*, No. J.C.C.P. No. 4106 (Cal. Sup. Ct. Aug. 29, 2000).

71.     Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis – called regression analysis – is commonly used in the real world and in litigation to determine the impact of an upstream price increase on product prices down the chain of distribution.

72.     Defendants' overcharges impacting the prices of packaged seafood products through the chain of their distribution can be measured and quantified. Commonly used and well accepted economic models can be used to measure both the existence and the amount of the supra-competitive charge passed through the chain of distribution. Thus, the economic harm to Plaintiffs and the members of the Classes can be quantified.

**PLAINTIFFS' CLAIMS ARE NOT BARRED
BY STATUTES OF LIMITATIONS**

**The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not
and Could Not Discover Their Claims Until Recently**

73.     Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until shortly before the filing of this Complaint. Plaintiffs and members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until July 23, 2015 at the earliest, the day Thai Union Frozen Products suspended its preferential public offering.

74.     Plaintiffs and the members of the Classes are consumers who had no direct contact or interaction with the Defendants, and had no means from which they could have discovered the combination or conspiracy described herein prior to July 23, 2015.

75.     No information in the public domain was available to Plaintiffs and members of the Classes prior to July 23, 2015 that revealed sufficient information to suggest that the Defendants were involved in a conspiracy to fix the prices charged for packaged seafood products. Plaintiffs and members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with direct purchasers, much less the fact that Defendants had engaged in the combination and conspiracy alleged herein.

76.     For these reasons, the statutes of limitations as the Plaintiffs and the Classes' claims did not begin to run, and has been tolled with respect to the claims alleged herein.

**Fraudulent Concealment Tolled the Statute of Limitations**

77.     In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations as to the claims asserted herein. Plaintiffs and members of the Classes did not know and could not have known of the existence of the conspiracy and unlawful combination alleged herein until July 23, 2015 at the earliest, the day Thai Union Frozen Products suspended its preferential public offering.

78.     Before that time, Plaintiffs and members of the Classes were unaware of Defendants' unlawful conduct, and did not know before then that they were paying supra-competitive prices for packaged seafood products throughout the United States, its territories, and the District of Columbia during the Class Period. No information, actual or constructive, was ever made available to Plaintiffs and members of the Classes that even hinted to Plaintiffs and the members of the Classes that they were being injured by Defendants' unlawful conduct.

79.     The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

80.     By its very nature, the Defendants' anticompetitive conspiracy and unlawful combinations were inherently self-concealing. Defendants met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered by any member of the public or by the direct purchasers with whom they did business.

81.     Plaintiffs and members of the Classes could not have discovered the alleged combination or conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conduct.

82.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until July 23, 2015, at the earliest.

83.     For these reasons, the statute of limitations applicable to Plaintiffs' and the Classes' claims was tolled and did not begin to run until July 23, 2015.

## ANTITRUST INJURY

84.     Defendants' unlawful activities had the following effects among others:

(a)     Price competition has been restrained or eliminated with respect to packaged seafood products;

(b)     The prices for packaged seafood products have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Indirect purchasers of packaged seafood products have been deprived of free and open competition; and

(d)     Indirect purchasers of packaged seafood products, including Plaintiffs and members of the Classes, paid artificially inflated prices.

85.     During the Class Period, Plaintiffs and members of the Classes paid supra-competitive prices for packaged seafood products.

86.     By reason of the alleged violations of the antitrust laws, Plaintiffs and members of the Classes have sustained injury to their business or property, having paid higher prices for packaged seafood products than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result have suffered damages. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## TRADE AND COMMERCE

87.     During the Class Period, Defendants engaged in a continuing conspiracy or combination in restraint of trade in violation of the Sherman Act and in violation of state law.

88.     During the Class Period, Defendants sold substantial quantities of packaged seafood products in a continuous and uninterrupted flow of interstate commerce to customers located throughout the United States, its territories, and the District of Columbia.

89.     Defendants' business activities that are described herein were within the flow of, and substantially affected, interstate trade and commerce. The collusive behavior alleged herein has a direct, substantial, and foreseeable adverse effect on U.S. commerce.

## CLASS ACTION ALLEGATIONS

90.     As used herein, "Class Period" means January 1, 2005 to the present.

91.     Plaintiffs bring this action on behalf of themselves and as a class action under 15 U.S.C. § 26 pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure seeking equitable and injunctive relief on behalf of the following Class (the "Nationwide Class"):

> All individuals and entities that indirectly purchased packaged seafood products for their own use and not for resale within the United States,

its territories and the District of Columbia from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time during the Class Period. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

92.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment on behalf of the following classes (the "Damages Classes"):

All individuals and entities that indirectly purchased packaged seafood products for their own use and not for resale in the Damages Classes States[3] from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time during the Class Period. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

93.    The Nationwide Class and the Damages Classes are referred to herein as the "Classes."

94.    Plaintiffs reserve the right to amend the Class definitions.

95.    Although Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are at least thousands of members in each of the Classes and that the members of each of the Classes are geographically dispersed throughout the United States, its territories, and the District of Columbia, thus making joinder of all Class members impracticable.

96.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which

---

[3]    The Damages Classes States are California, Florida, Iowa, Kansas, Minnesota, Missouri, Nebraska, Nevada, New York, North Dakota, Utah, and Wisconsin. These states are listed in Counts II and III, and each state class comprises individuals and entities that have made indirect purchases of Defendants' packaged seafood products in the state for their own use and not for resale.

was applicable to all of the members of the Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

       a.    Whether Defendants engaged in a combination or conspiracy with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for packaged seafood products;

       b.    Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for packaged seafood products;

       c.    The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for packaged seafood products;

       d.    Whether Defendants violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

       e.    Whether Defendants violated state antitrust, unfair competition, and consumer protection laws;

       f.    Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

       g.    Whether, and to what extent, the conduct of Defendants caused injury to Plaintiffs and members of the Classes, and, if so, the appropriate measure of damages; and

       h.    Whether Plaintiffs and members of the Classes are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Sections 1 and 3 of the Sherman Act.

97.     Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.

98.     Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust, unfair competition, and class action litigation.

99.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

100.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

101.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

102.   Plaintiffs bring the Damages Classes pursuant to Rule 23, on behalf of all persons and entities that, as residents of various states, indirectly purchased packaged seafood products that a Defendant or co-conspirator manufactured during the Class Period.

24

## VIOLATIONS ALLEGED
### COUNT I

**Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. Sections 1, 3)**
**(On Behalf of Plaintiffs and the Nationwide Class)**

103. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

104. Defendants and their co-conspirators engaged in a continuing contract, combination, and conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of packaged seafood products within the United States, its territories, and the District of Columbia in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

105. Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive levels, the prices of such packaged seafood products.

106. In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the price of packaged seafood products.

107. The illegal combination and conspiracy alleged herein had the following effects, among others:

a. The prices charged by Defendants to, and paid by, Plaintiffs and members of the Nationwide Class for packaged seafood products were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

b. Plaintiffs and members of the Nationwide Class have been deprived of free and open competition in the purchase of packaged seafood products;

c. Plaintiffs and members of the Nationwide Class have been required to pay more for packaged seafood products than they would have paid in a

25

competitive marketplace absent Defendants' price-fixing conspiracy;

d. Competition in the sale of packaged seafood products has been restrained, suppressed or eliminated.

108. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Nationwide Class have been injured and damaged in their business and property in an amount to be determined according to proof.

109. These violations are continuing and will continue unless enjoined by this Court.

110. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Nationwide Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT II

### Violation of State Antitrust Statutes
### (On Behalf of Plaintiffs and the Damages Class)

111. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

112. Plaintiffs further allege as follows:

a. Beginning at a time presently unknown to Plaintiffs, but at least as early as January 1, 2005, and continuing thereafter to the present, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professional Code. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of packaged seafood products at supracompetitive levels.

b. The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their coconspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of,

26

1  and to allocate markets for packaged seafood products.

2          c.     For the purpose of forming and effectuating the unlawful trust,
3  the Defendants and their co-conspirators have done those things which they
4  combined and conspired to do, including but in no way limited to the acts,
5  practices, and course of conduct set forth above and the following: (1) fixing,
6  raising, stabilizing and/or maintaining the price of packaged seafood products; and
7  (2) allocating among themselves the production of packaged seafood products.

8          d.     The combination and conspiracy alleged herein has had, *inter*
9  *alia*, the following effects: (1) price competition in the sale of packaged seafood
10  products has been restrained, suppressed and/or eliminated in the State of
11  California; (2) prices for packaged seafood products sold by Defendants and their
12  co-conspirators have been fixed, raised, maintained and stabilized at artificially
13  high, non-competitive levels in the State of California; and (3) those who purchased
14  packaged seafood products directly or indirectly from Defendants and their co-
15  conspirators have been deprived of the benefit of free and open competition.

16          e.     As a direct and proximate result of Defendants' unlawful
17  conduct, Plaintiffs and California consumers have been injured in their business and
18  property in that they paid more for packaged seafood products than they otherwise
19  would have paid in the absence of Defendants' unlawful conduct. As a result of
20  Defendants' violation of Section 16720 *et seq*. of the California Business and
21  Professions Code, Plaintiffs and the California consumers seek treble damages and
22  the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a)
23  of the California Business and Professions Code.

24      113.   Plaintiffs further allege as follows:

25          a.     Defendants agreed to, and did in fact, act in restraint of trade or
26  commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or
27  non-competitive levels, the prices at which packaged seafood products were sold,
28  distributed or obtained in Iowa.

b.       Defendants' combinations or conspiracies had the following effects: (1) packaged seafood product price competition was restrained, suppressed, and eliminated throughout the Iowa; (2) packaged seafood product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the Iowa; (3) Iowa consumers paid supracompetitive, artificially inflated prices for packaged seafood products.

c.       During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

d.       As a direct and proximate result of Defendants' unlawful conduct, Iowa consumers have been injured in their business and property and are threatened with further injury.

e.       By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1 et seq. Accordingly, Iowa consumers seek all forms of relief available under Iowa Code § 553.1.

114.     Plaintiffs further allege as follows:

a.       Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which packaged seafood products were sold, distributed or obtained in Kansas.

b.       Defendants' combinations or conspiracies had the following effects: (1) packaged seafood product price competition was restrained, suppressed, and eliminated throughout Kansas; (2) packaged seafood product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Kansas consumers paid supracompetitive, artificially inflated prices for packaged seafood products.

c.       During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, Kansas consumers have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101 et seq. Accordingly, Kansas consumers seek all forms of relief available under Kansas Stat. Ann. §§ 50-101 et *seq*.

115.   Plaintiffs further allege as follows:

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which packaged seafood products were sold, distributed or obtained in Minnesota.

b.     Defendants' combinations or conspiracies had the following effects: (1) packaged seafood product price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) packaged seafood product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Minnesota consumers paid supracompetitive, artificially inflated prices for packaged seafood products.

c.     During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, members of the Minnesota consumers have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49 et *seq*. Accordingly, Minnesota purchasers seek all forms of relief available under Minnesota Stat. §§ 325D.49 et *seq*.

116.   Plaintiffs further allege as follows:

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which packaged seafood products were sold, distributed or obtained in Nebraska.

b. Defendants' unlawful conduct had the following effects: (1) packaged seafood products price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) packaged seafood product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and Nebraska consumers were deprived of free and open competition; and (4) Plaintiffs and Nebraska consumers paid supra-competitive, artificially inflated prices for packaged seafood products.

c. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Nebraska consumers have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Neb. Rev. Stat. §§ 59-801 et *seq.* Accordingly, Plaintiffs and Nebraska consumers seek all relief available under Neb. Rev. Stat. §§ 59-801 et *seq.*

117. Plaintiffs further allege as follows:

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which packaged seafood products were sold, distributed or obtained in Nevada.

b. Defendants' combinations or conspiracies had the following effects: (1) packaged seafood product price competition was restrained, suppressed, and eliminated throughout Nevada; (2) packaged seafood product prices were

raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Nevada consumers paid supracompetitive, artificially inflated prices for packaged seafood products.

c. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

d. As a direct and proximate result of Defendants' unlawful conduct, Nevada consumers have been injured in their business and property and are threatened with further injury.

e. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq.*[4] Accordingly, Nevada consumers seek all forms of relief available under Nevada Rev. Stat. Ann. §§ 598A *et seq.*

118. Plaintiffs further allege as follows:

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which packaged seafood products were sold, distributed or obtained in New York.

b. Defendants' combinations or conspiracies had the following effects: (1) packaged seafood product price competition was restrained, suppressed, and eliminated throughout New York; (2) packaged seafood product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) New York consumers paid supracompetitive, artificially inflated prices for packaged seafood products.

c. During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

---

[4] In compliance with the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. § 598A.210(3), Plaintiffs concurrently mailed a copy of this Complaint to the Nevada Attorney General.

d.     As a direct and proximate result of Defendants' unlawful conduct, New York consumers have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New York General Business Law §§ 340 *et seq*. Accordingly, New York consumers seek all forms of relief available under New York Gen. Bus. Law §§ 340 *et seq*.[5]

119.   Plaintiffs further allege as follows:

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which packaged seafood products were sold, distributed or obtained in North Dakota.

b.     Defendants' combinations or conspiracies had the following effects: (1) packaged seafood product price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) packaged seafood product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) North Dakota consumers paid supracompetitive, artificially inflated prices for packaged seafood products.

c.     During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, North Dakota consumers have been injured in their business and property and are threatened with further injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq*. Accordingly, North Dakota consumers seek all forms of relief

---

[5]  In accordance with New York Gen. Bus. Law § 340(5), Plaintiffs concurrently served a copy of this Complaint on the New York Attorney General.

available under North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

120.    Plaintiffs further allege as follows:

        a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which packaged seafood products were sold, distributed or obtained in Utah.

        b.    Defendants' combinations or conspiracies had the following effects: (1) packaged seafood product price competition was restrained, suppressed, and eliminated throughout Utah; (2) packaged seafood product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Utah consumers paid supracompetitive, artificially inflated prices for packaged seafood products.

        c.    During the Class Period, Defendants' illegal conduct substantially affected Utah commerce.

        d.    As a direct and proximate result of Defendants' unlawful conduct, Utah consumers have been injured in their business and property and are threatened with further injury.

        e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Ann. §§ 76-10-3101 *et seq.* Accordingly, Utah consumers seek all forms of relief available under Utah Code Ann. §§ 76-10-3101 *et seq.*

121.    Plaintiffs further allege as follows:

        a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which packaged seafood products were sold, distributed or obtained in Wisconsin.

        b.    Defendants' combinations or conspiracies had the following effects: (1) packaged seafood product price competition was restrained, suppressed,

and eliminated throughout Wisconsin; (2) packaged seafood product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Wisconsin consumers paid supracompetitive, artificially inflated prices for packaged seafood products.

c.    During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, Wisconsin consumers have been injured in their business and property and are threatened with further injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01 *et seq*. Accordingly, Wisconsin consumers seek all forms of relief available under Wisconsin Stat. §§ 133.01 *et seq*.

## COUNT III

### State Consumer Protection and Unfair Competition Statutes
### (On Behalf of Plaintiffs and the Damages Class)

122.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

123.   Plaintiffs further allege as follows:

a.    Beginning on a date unknown to Plaintiffs, but at least as early as January 1, 2005, and continuing thereafter to the present, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above.

b.    This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

34

c.     The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq*., of the California Business and Professions Code, set forth above.

d.     Defendants' acts, omissions, misrepresentations, practices and nondisclosures, as described above, whether or not in violation of Section 16720, *et seq*. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; Defendants' act and practices are unfair to consumers of packaged seafood products in the State of California and throughout the United States, within the meaning of Section 17200, California Business and Professions Code.

e.     Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

f.     California Plaintiff and each of the California consumers members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

g.     The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

h.     The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and California consumers to pay supra-competitive and artificially-inflated prices for

packaged seafood products. Plaintiffs and California consumers suffered injury in fact and lost money or property as a result of such unfair competition.

i.    The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

j.    As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the California consumers are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business practices, pursuant to California Business & Professions Code § 17200 *et seq*.

124.    Plaintiffs further allege as follows:

a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which packaged seafood products were sold, distributed or obtained in Florida.

b.    The foregoing conduct constitutes "unfair methods of competition," and "unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Florida Stat. § 501.204.

c.    During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

d.    Defendants' unlawful conduct had the following effects: (1) packaged seafood product price competition was restrained, suppressed, and eliminated throughout Florida; (2) packaged seafood product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) Florida consumers were deprived of free and open competition; and (4) Florida consumers paid supracompetitive, artificially inflated prices for packaged seafood products.

e.     As a direct and proximate result of Defendants' conduct, Florida consumers have been injured and are threatened with further injury.

f.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. §§ 501.201 *et seq*., and accordingly, Florida consumers seek all relief available under that statute.

125.   Plaintiffs further allege as follows:

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which packaged seafood products were sold, distributed or obtained in Minnesota.

b.     The foregoing conduct constitutes a "fraud, false pretense, . . . or deceptive practice" within the meaning of Minn. Stat. § 325F.69.

c.     Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

d.     During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers.

e.     Defendant's conduct was willful.

f.     As a direct and proximate result of Defendants' conduct, Minnesota consumers have been injured and are threatened with further injury.

g.     Through the foregoing conduct, Defendants engaged in deceptive trade practices with the intent to injure competitors and consumers through supracompetitive profits.

h.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. §§ 325F.68 *et seq*., and accordingly, Minnesota consumers seek all relief available under that statute.

126.   Plaintiffs further allege as follows:

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or

non-competitive levels, the prices at which packaged seafood products were sold, distributed or obtained in Missouri.

        b.     Defendants concealed, suppressed, and omitted to disclose such material facts to Plaintiffs and Missouri consumers concerning Defendants' unlawful activities and artificially inflated prices for packaged seafood products.

        c.     Defendants' concealments and failures to disclose were deceptive as they had the tendency or capacity to mislead Plaintiffs and Missouri consumers to believe they were purchasing packaged seafood products at prices established by a free and fair market.

        d.     Defendants' unlawful conduct had the following effects: (1) packaged seafood product price competition was restrained, suppressed, and eliminated throughout Missouri; (2) packaged seafood product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Missouri; (3) Missouri consumers were deprived of free and open competition; and (4) Missouri consumers paid supracompetitive, artificially inflated prices for packaged seafood products.

        e.     As a direct and proximate result of Defendants' conduct, Missouri consumers have suffered ascertainable injury and are threatened with further injury.

        f.     The foregoing acts and practices constitute unlawful practices in violation of Mo. Rev. Stat. § 407.020. Accordingly, Missouri consumers seek all relief available under that statute.

    127.   Plaintiffs further allege as follows:

        a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which packaged seafood products were sold, distributed or obtained in Nebraska.

        b.     The foregoing conduct constitutes "unfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Neb. Rev. Stat. § 59-1602.

      c.    During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

      d.    Defendants' unlawful conduct had the following effects: (1) packaged seafood product price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) packaged seafood product prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Nebraska consumers were deprived of free and open competition; and (4) Nebraska consumers paid supracompetitive, artificially inflated prices for packaged seafood products.

      e.    As a direct and proximate result of Defendants' conduct, Nebraska consumers have been injured and are threatened with further injury.

      f.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §§ 59-1601 *et seq*., and accordingly, Nebraska consumers seek all relief available under that statute.

    128.    Plaintiffs further allege as follows:

      a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which packaged seafood products were sold, distributed or obtained in New York.

      b.    Defendants also took efforts to conceal their agreements from New York consumers.

      c.    Defendants' illegal conduct substantially affected New York commerce and consumers.

      d.    The conduct of Defendants as described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the

public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

e. As consumers, New York consumers were targets of the conspiracy.

f. Defendants' secret agreements as described herein were not known to members New York consumers.

g. Defendants made public statements about the price of packaged seafood products that Defendants knew would be seen by New York consumers; such statements either omitted material information that rendered these statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for packaged seafood products; and, Defendants alone possessed material information that was relevant to consumers, but failed to provide the information.

h. Because of Defendants' unlawful trade practices in the State of New York, there was a broad impact on New York consumers who indirectly purchased packaged seafood products; and New York consumers have been injured because they have paid more for packaged seafood products than they would have paid in the absence of Defendants' unlawful trade acts and practices, and are threatened with further injury.

i. Because of Defendants' unlawful trade practices in the State of New York, New York consumers who indirectly purchased packaged seafood products were misled to believe that they were paying a fair price for packaged seafood products, or that the price increases for packaged seafood products were for valid business reasons.

j. Defendants knew that their unlawful trade practices with respect to pricing of packaged seafood products would have an impact on New York consumers and not just Defendants' direct customers;

k. Defendants knew that their unlawful trade practices with

respect to pricing of packaged seafood products would have a broad impact, causing consumer class members who indirectly purchased packaged seafood products to be injured by paying more for packaged seafood products than they would have paid in the absence of Defendants' unlawful trade acts and practices.

l.     During the Class Period, each of the Defendants named herein, directly or indirectly through affiliates they dominated and controlled, manufactured, sold and/or distributed packaged seafood products in New York.

m.     New York consumers seek actual damages for their injuries caused by these violations in an amount to be determined at trial. Without prejudice to their contention that Defendants' unlawful conduct was willful and knowing, New York consumers do not seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus. Law § 349 (h).

## COUNT IV

### Unjust Enrichment and Disgorgement of Profits
### (On Behalf of Plaintiffs and the Damages Class)

129.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

130.   As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by receipt of, as a minimum, unlawfully inflated profits of packaged seafood products.

131.   Defendants have benefitted from their unlawful acts and it would be inequitable for them to be permitted to retain any of the ill-gotten gains resulting from the overpayments made for packaged seafood products by Plaintiffs and the members of the Damages Class.

132.   Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and the members of the Damages Class are entitled to

41

the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the members of the Damages Class may make claims on a pro rata basis.

133. Plaintiffs and the class members of the Damages Class seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and the Damages Class members may seek restitution.

134. Pursuit of any remedies against the entities from which Plaintiffs and the members of the Damages Class purchased packaged seafood products subject to Defendants' conspiracy would have been futile, given that those entities did not take part in Defendants' conspiracy.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray:

A. That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Classes;

B. That the Court adjudge and decree that the contract, combination and conspiracy alleged herein is a per se unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

C. That the Court adjudge and decree that the contract, combination and conspiracy alleged herein is a violation of the state antitrust and unfair competition laws, state consumer protection laws, and constitutes unjust enrichment of Defendants;

D. That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiffs and the Classes;

E. That the Court award Plaintiffs and the Classes treble damages to the extent such laws permit;

F.      That the Court award Plaintiffs and the Classes attorneys' fees and costs as well as pre-judgment and post-judgment interest as permitted by law;

G.      That Defendants and their co-conspirators, their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or their coconspirators, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combination, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or affect in restraining competition; and

H.      That the Court award Plaintiffs and the members of the Classes such other and further relief as may be deemed necessary and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial on all matters so triable.

DATED: September 29, 2015          HULETT HARPER STEWART LLP
                                   DENNIS STEWART
                                   KIRK B. HULETT



                                    */s/ Dennis Stewart*
                                   DENNIS STEWART

                                   550 West C Street, Suite 1500
                                   San Diego, CA  92101
                                   Telephone:  (619) 338-1133
                                   Facsimile:  (619) 338-1139
                                   Email:      dennis@hulettharper.com

43

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GUSTAFSON GLUEK PLLC
DANIEL E. GUSTAFSON, MNBN: 202241
DANIEL C. HEDLUND, MNBN: 258337
MICHELLE J. LOOBY, MNBN: 0388166
DANIEL J. NORDIN, MNBN: 0392393
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN  55402
Telephone:   (612) 333-8844
Facsimile:    (612) 339-6622
Email:          dgustafson@gustafsongluek.com
                    dhedlund@gustafsongluek.com
                    mlooby@gustafsongluek.com
                    dnordin@gustafsongluek.com

SULLIVAN HILL
DONALD G. REZ, SBN: 82615
550 West C Street, 15th Floor
San Diego, CA  92101
Telephone:   (619) 233-4100
Facsimile:    (619) 231-4372
Email:          rez@sullivanhill.com

Attorneys for Plaintiffs, Nay Alidad, Galyna
Andrusyshyn, Robert Benjamin, Barbara
Buenning, Danielle Greenberg, Sheryl Haley,
Lisa Hall, Tya Hughes, Marissa Jacobus,
Gabrielle Kurdt, Erica Pruess, Seth Salenger,
and Harold Stafford